Opinion
 

 NICHOLSON, J.
 

 A disappointed bidder resorted to litigation to regain a government contract it had secured for 35 years—a contract to produce California drivers’ licenses. The disappointed bidder lost, on every timely issue raised before the hearing officer, the administrative board, and the superior court. However, the superior court, exceeding its circumscribed review of administrative decisions, reversed the board, relying on a legal theory never raised in the administrative proceedings.
 

 The superior court’s rulings have prevented the state from implementing the new contract with the successful bidder. Instead, the rulings have compelled the state to continue the previous contract with the disappointed bidder—under which the state pays 64 percent more for each license.
 

 
 *331
 
 We reverse both the judgment granting the petition for writ of mandate and the order granting the preliminary injunction.
 
 [1]
 

 Factual and Procedural Background
 

 In May 1994, the Department of General Services issued a request for proposals (RFP DMV-3026), soliciting bids for a turn-key production system to produce plasticized or plastic-based, nonembossed, credit-card size, color photo drivers’ licenses, identification cards, and salesperson licenses for the Department of Motor Vehicles (DMV Project).
 
 [2]
 
 The DMV Project required developing a related “image database,” to be housed on the successful bidder’s computers.
 
 [3]
 
 The image database, to which law enforcement would have access, would contain the photographs and demographic information of all individuals holding drivers’ and salesperson licenses and identification cards.
 

 Among the bidders for this project were NBS Imaging Systems, Inc., which had been the vendor for California drivers’ licenses since 1962, and Polaroid Corporation. Polaroid submitted two bids on the DMV Project, and its two bids received the two highest scores.
 
 [4]
 

 
 *332
 
 Polaroid’s bids contemplated a subcontract with AT&T Global Solutions, which in turn, contemplated a subcontract with Computer Deductions, Inc. (CDI) GDI’s contribution as a sub-subcontractor was to involve design work related to the software necessary to develop the image database to store the photographs and demographic information.
 

 After Polaroid won the DMV Project contract, NBS tendered a timely protest to the Department of General Services, which forwarded the protest to the Board of Control. NBS subsequently submitted a 100-page “Detailed Statement of Protest,” in which it presented a myriad of challenges to Polaroid’s bids. In one of these challenges, NBS relied on two specific authorities to assert Polaroid could not legally contract with CDI because CDI previously had provided consulting services to the DMV, and thus Polaroid’s bids were invalid due to GDI’s conflict of interest.
 
 [5]
 

 Nearly three years before the DMV’s request for proposals on this project, CDI provided consulting services on another DMV matter known as the Database Redevelopment Project or Database Revitalization Project. This project involved evaluating the feasibility of transferring the DMV’s driver’s license and vehicle registration database from IBM computers to $18 million in newly purchased Tandem Cyclone computers.
 
 [6]
 
 The DMV abandoned the project after it determined transferring the database to the Tandem computers would not be cost-effective. DMV staff, in a brainstorming session, identified 22 possible uses for the Tandem computer hardware, and decided to analyze further 7 of these uses for viability. The staff, together with consultants from CDI, evaluated, and rejected, these potential alternative uses. One of the rejected potential uses was housing the image database for the DMV Project. The RFP for the DMV Project was drafted before CDI participated in the database redevelopment project; CDI played no role in developing or drafting the RFP.
 

 NBS challenged Polaroid’s bid exclusively on the basis of violations of Public Contract Code section 10365.5 and State Administrative Manual
 
 *333
 
 section 5202. As facts supporting these purported violations, NBS alleged GDI’s previous consulting services “resulted] from or related to” four of the RFP specifications for the DMV Project: (1) on line data transfer, (2) field office photo retrieval, (3) law enforcement access to the DMV database, and (4) points for less than five-day card production delivery to the DMV. NBS later supplemented its protest to include 14 additional exhibits and an additional factual allegation: GDI’s participation in the review as to whether the Tandem computers should house the image database.
 

 After a 14-day hearing, the hearing officer found NBS’s claims were not supported by the evidence and issued a proposed decision denying NBS’s protest. The Board of Control adopted the hearing officer’s findings of fact and the proposed decision. The board concluded neither Public Contract Code section 10365.5 nor State Administrative Manual section 5202 applied, and thus there was no valid ground for NBS’s protest. Additionally, the board found even if these sections applied, CDI did not come within the sections’ terms because CDI itself “has not submitted a bid nor will it be awarded a contract,” and “[n]o credible evidence has been offered which would support a conclusion that CDI, functioning as a subcontractor for Polaroid, would be providing services . . . as an end product of its consulting services contract” within the meaning of these sections.
 

 Furthermore, the board found the facts did not support a finding of a conflict of interest. The board found the DMV had already drafted the RFP for the DMV Project before considering whether the Tandem computers might be suitable for housing the image database, and found “no provisions in the previously drafted RFP were in any way changed or affected by GDI’s participation in considering alternate uses for the Tandems.” CDI had “no involvement in the development or drafting of provisions of the RFP, and in fact had no knowledge of what was in the RFP,” and GDI’s services under the RFP were not “required, suggested, or otherwise deemed appropriate in the end product of [its] consulting service contract.”
 

 NBS then sought administrative and traditional mandamus in the superior court. (See Code Civ. Proc., §§ 1085, 1094.5.) The superior court found substantial evidence supported the board’s findings of fact, and rejected both of NBS’s legal bases for relief—Public Contract Code section 10365.5 and State Administrative Manual section 5202. However, the superior court then overstepped its statutory bounds.
 
 [7]
 
 Relying on State Administrative Manual former section 1285(4)—a legal theory never presented in the administrative
 
 *334
 
 proceedings—the superior court concluded CDI could not participate in the DMV Project. Accordingly, the superior court issued a peremptory writ of mandate directing the board of Control to grant NBS’s protest and to declare the award of the contract to Polaroid invalid.
 

 The court reasoned: “What CDI did had a profound influence on the final form of the RFP, because CDI was involved in rejecting a proposal which would have led to a major change in the requirements of the RFP, At all times, the RFP called for the photo image database to be housed on the vendor’s computers, and not at the DMV. If CDI had recommended that the database should be stored on the Tandems, the RFP would have been changed to reflect this new requirement. In fact, the release of the RFP was held up while this issue was under discussion. When CDI recommended that the database should not be maintained on the Tandems, it in effect recommended, or suggested, that the database should be maintained by the outside vendor, and thus effectively recommended, or suggested, that the RFP should not be changed. This is shown by the fact that the RFP was released without change once the decision was made not to use the Tandems. The Court thus finds that the effect of GDI’s recommendations was to suggest that the database be maintained by an outside vendor. GDI’s work as part of the Polaroid teams involves work on the software related to the photo image database. In effect, it will be doing work that was suggested by its recommendation to keep the database with an outside vendor . . . .”
 

 Polaroid continued its preparations and was set to begin license production on July 22, 1996. In June 1996, NBS filed a petition seeking a temporary restraining order and preliminary and permanent injunction, and the superior court issued a preliminary injunction enjoining further performance of the DMV contract during the pendency of this appeal.
 
 [8]
 

 
 *335
 
 Discussion
 

 “The court’s review of the administrative decision extends ‘to the questions whether the [administrative agency] has proceeded without, or in excess of jurisdiction; whether there was a fair trial; and whether there was any prejudicial abuse of discretion. Abuse of discretion is established if the [administrative agency] has not proceeded in the maimer required by law, the order or decision is not supported by the findings, or the findings are not supported by the evidence.’ [Citation.] The courts review the findings and decision of the administrative agency under a substantial evidence standard, as here, when no fundamental vested right is implicated. [Citation.] ‘When the substantial evidence test applies, the trial court exercises an essentially appellate function in determining whether the administrative record is free from legal error. On appeal, our scope of review is identical to that of the trial court.’ ”
 
 (National Identification Systems, Inc.
 
 v.
 
 State Bd. of Control
 
 (1992) 11 Cal.App.4th 1446, 1454 [15 Cal.Rptr.2d 257].)
 

 I
 

 In the course of the various proceedings challenging Polaroid’s bid, NBS has offered four potential bases upon which the arbiter could declare the bid invalid: (1) Public Contract Code section 10365.5, (2) State Administrative Manual section 5202, (3) State Administrative Manual former section 1285(4),
 
 [9]
 
 and (4) paragraph II.B.15 of the RFP.
 
 [10]
 
 The first two authorities— Public Contract Code section 10365.5 and State Administrative Manual
 
 *336
 
 section 5202—were raised in NBS’s protest, but were rejected as inapplicable at every level of these proceedings. The hearing officer, the Board of Control, and the superior court all rejected both of these sections as legal bases for invalidating Polaroid’s bid. The remaining two authorities were not timely mentioned either in NBS’s protest or during the administrative proceedings. Indeed, State Administrative Manual former section 1285(4)—the basis upon which the trial court invalidated Polaroid’s bid—appeared for the first time in NBS’s
 
 reply brief
 
 in the superior court proceedings.
 

 Subdivision (h) of Public Contract Code section 12102 governs protest procedures. This subdivision provides: “. . . [Protests must be filed no later than five working days after the issuance of an intent to award. Authority to protest may be limited to participating bidders. . . . Within 10 calendar days after filing a protest, the protesting vendor shall file with the State Board of Control
 
 a full and complete written statement specifying in detail the grounds of the protest and the facts in support thereof
 
 ” (Italics added.)
 

 NBS’s protest specified that its challenge was based solely upon Public Contract Code section 10365.5 and State Administrative Manual section 5202. The hearing officer and the board addressed the applicability of these two sections in detail. As noted above, NBS made no timely
 
 *337
 
 mention of State Administrative Manual former section 1285(4) or RFP DMV-3026 paragraph II.B.15 in the administrative proceedings. Accordingly, the hearing officer and the board had no opportunity to evaluate the application or import of these tardy assertions and the superior court had no authority to consider them. (See
 
 Digital Biometrics, Inc.
 
 v.
 
 Anthony
 
 (1993) 13 Cal.App.4th 1145, 1156 [17 Cal.Rptr.2d 43].)
 
 [11]
 

 The superior court erred in granting relief based on a legal theory never presented during the administrative proceedings. (See
 
 People
 
 v.
 
 West Publishing Co.
 
 (1950) 35 Cal.2d 80, 88 [216 P.2d 441];
 
 Robinson
 
 v.
 
 Department of Fair Employment & Housing
 
 (1987) 192 Cal.App.3d 1414, 1417 [239 Cal.Rptr. 908] [“exhaustion of remedies doctrine applies equally to questions of law and fact”].) We next consider the two authorities discussed in NBS’s respondent’s brief which were presented during the administrative proceedings—Public Contract Code section 10365.5 and State Administrative Manual section 5202.
 
 [12]
 

 
 *338
 
 II
 

 Public Contract Code section 10365.5, subdivision (a), provides: “No person, firm, or subsidiary thereof who has been awarded a consulting services contract may submit a bid for, nor be awarded a contract for, the provision of services, procurement of goods or supplies, or any other related action which is required, suggested, or otherwise deemed appropriate in the end product of the consulting services contract.” This section does not apply to “[transactions covered under Chapter 3 (commencing with Section 12100).” (Pub. Contract Code, § 10430, subd. (b).) Chapter 3 pertains to the acquisition of electronic data processing and telecommunication goods and services. (See Pub. Contract Code, § 12102.)
 

 Similarly, section 5202 of the State Administrative Manual states, in pertinent part: “The requirements of Public Contract Code Section 10365.5 and this section are applicable to any information technology contract
 
 that includes a consulting component.
 
 fiD ... [‘ID ... No person, firm, or subsidiary thereof who has been awarded a consulting services contract, or a contract which includes a consulting component, may be awarded a contract for the provision of services, delivery of goods or supplies, or any other related action which is required, suggested, or otherwise deemed appropriate as an end product of the consulting services contract. . . .” (Italics added.)
 

 Consistent with the conclusion of every other tribunal in these proceedings, we find Public Contract Code section 10365.5 and State Administrative Manual section 5202 do not apply to Polaroid’s bid. First, with regard to Public Contract Code section 10365.5, the parties themselves have conceded the DMV Project comes within section 10365.5’s express exemption for transactions covered by chapter 3. As noted by the board,
 
 “It is undisputed
 
 that RFP DMV-3026 was issued under Chapter 3 relating to the acquisition of electronic data processing systems and telecommunications goods and services.” (Italics added.) The superior court similarly observed,
 
 “The parties here are in agreement,
 
 and the Court finds, that the procurement in question here involved electronic data processing goods and services. Accordingly, the Court finds that Section 10365.5(a) does not apply to this procurement.”
 
 [13]
 
 (Italics added.)
 

 With regard to State Administrative Manual section 5202, this section applies to any information technology contract which includes a consulting
 
 *339
 
 component. The board expressly found: “No credible evidence was offered by NBS establishing that the information technology contract that will be awarded pursuant to the RFP will include a ‘consulting component.’ A review of the RFP appears to indicate that such a component is not involved in this acquisition.”
 

 GDI’s prior consulting work for the DMV regarding the Tandem computers did not result in “requiring], suggesting], or otherwise deem[ing] appropriate in the end product of the consulting services contract” its sub-subcontracting design work for Polaroid, which relates to the software necessary to develop the image database for storing the photographs and demographic information. The board found: “GDI has not submitted a bid nor will it be awarded a contract for services, goods, supplies, ‘or any other related action which is required, suggested, or otherwise deemed appropriate in the end product of the consulting service contract.’ [Citation.] No credible evidence has been offered which would support a conclusion that CDI, functioning as a subcontractor for Polaroid, would be providing services, goods, or supplies as an end product of its consulting services contract within the meaning of this statutory prohibition. Nor did GDI’s activities relative to the possible use of the Tandems for the image database have any impact on RFP 3026. The final DMV draft of the RFP was ready for release to the Department of General Services prior to the Information Technology Steering Committee discussion to investigate possible use of the Tandems. [Citation.] The RFP was released without change after the April 29, 1994, decision not to utilize the Tandems for the images database. [Citation.]
 
 *340
 
 Though there was a short delay in release of the RFP, no provisions in the previously drafted RFP were in any way changed or affected by GDI’s participation in considering alternative uses for the Tandems. [ID Further, while NBS alleged in its detailed statement of protest that GDI had input in developing the specifications for the RFP [citation], no credible evidence supporting such allegations was presented by NBS. Very convincing, unrefuted testimony was given which appears to clearly establish that the GDI representatives had no involvement in the development or drafting of provisions of the RFP, and in fact had no knowledge of what was in the RFP. [Citations.] []D The apparent caution exercised by DMV in not involving the GDI consultants in the RFP process was further reflected when a meeting was held on September 21, 1994, to consider issuance of an addendum to the RFP requiring the contractor to use the State’s Calnet for transmission of data. [Citation.] GDI’s consultant. . . was excluded from the meeting while the Calnet subject was discussed. [Citation.]”
 

 NBS’s argument takes the fact a DMV committee, in consultation with GDI, concluded one particular computer system—the Tandem system— would not work, and attempts to turn this into a “recommendation” for every conceivable alternative. The committee made no alternative “recommendation” whatsoever; it simply concluded the Tandem system was not feasible. The committee did not study the best options for housing the image database. Other potential alternatives existed, such as housing the database on the existing IBM computers, having the DMV acquire or lease other computers, storing the database with another state agency, or any number of other options. The committee merely concluded the Tandem computers were not a cost-effective method of storing the database. GDI did not “suggest” housing the database on the winning bidder’s computers within the meaning of Public Contract Code section 10365.5 and State Administrative Manual section 5202.
 
 [14]
 
 Accordingly, these sections do not apply to Polaroid’s bid.
 
 [15]
 

 The superior court erred prejudicially in overturning the board’s decision and enjoining Polaroid’s contract with the DMV.
 

 Disposition
 

 The judgment in No. 96CS00148 is reversed and the peremptory writ of mandate is vacated. The superior court is directed to enter a new and
 
 *341
 
 different judgment denying the writ petition. The judgment (order) in No. 96AS03485, granting the preliminary injunction, is vacated with directions to enter a new and different order denying NBS’s application. Appellants shall recover their costs on appeal in both actions.
 

 Davis, Acting P. J., and Raye, J., concurred.
 

 A petition for a rehearing was denied January 21, 1998, and respondent’s petition for review by the Supreme Court was denied March 18, 1998.
 

 [1]
 

 We have consolidated, on our own motion, the appeals from (1) the issuance of the writ (C024030) and (2) the preliminary injunction (C024822).
 

 [2]
 

 We grant respondent’s January 29,1997, request to augment the record on appeal, with the exception of request No. 2. Request No. 1 is a copy of an exhibit which was part of the administrative record; request No. 3 is a copy of the contract between Polaroid and the DMV, which is already part of the clerk’s transcript in this action. We deny request No. 2, which includes copies of electronic mail messages and internal DMV memoranda, because these documents which were not part of the administrative record. We deny respondent’s January 29, 1997, and May 27, 1997, requests for judicial notice as unnecessary. The January 29, 1997, request concerned legislative history documents; the May 27, 1997, request concerned documents filed in a previous writ proceeding in this court. (See fn. 13,
 
 post.)
 

 [3]
 

 The Board of Control described the DMV Project as including, but not limited to: “1. Developing a workplan/installation schedule. [*J0 2. Providing a centralized production system to produce a secure plasticized or plastic-based, credit card size, non-embossed driver license, identification card, and salesperson license, which contains a 3-track magnetic stripe and bar code. [SO 3. Ability to capture, store, and retrieve the photo, signature and fingerprint. HO 4. Providing all video equipment supplies, maintenance, user instructions, training for DMV personnel, documentation of system design, and any hardware and/or software technical specifications necessary to interface between the DMV and vendor systems. [<]D 5. Providing a digitalized database not located on DMV premises. The database is to be available 24 hours a day, seven (7) days a week. []D 6. Providing the hardware/software needed to inquire into the digitized [sic] database; and retrieve and produce a color print for photo/signature requests and a black/white print for fingerprint requests. [1 7. Providing post-implementation system support and maintenance. []D 8. Providing management reports relative to the number of. . . cards produced.”
 

 [4]
 

 The bid scoring included technical merit as well as cost efficiency, in accordance with the “value-effective” (as contrasted with purely “cost-effective”) criteria permitted by Public
 
 *332
 
 Contract Code section 12102, subdivision (b). Polaroid’s bids scored 0.9686 and 0.9010; NBS’s bids scored 0.8872 and 0.8759. Polaroid’s bids received technical points of 709 and 689; NBS’s bids received technical points of 535 and 525.
 

 [5]
 

 NBS’s detailed statement also asserted: (1) Polaroid’s proposed use of the California Department of Justice Hawkins Data Center was an unconstitutional gift of public funds; (2) Polaroid’s contract with the Orange County Sheriff’s/Coroner’s office as a site for a disaster recovery data base was an unconstitutional gift of public funds; (3) Polaroid’s security feature did not meet the RFP specifications; (4) the DMV’s evaluation of NBS’s bid was unfair in at least 13 areas; and (5) the DMV’s failure to require bidders to provide supporting technical data caused an unfair result.
 

 [6]
 

 The board found this driver’s license and vehicle registration database “is separate and distinct from the photo image database required” by the DMV Project.
 

 [7]
 

 When a writ is issued for the purpose of inquiring into the validity of a final administrative order or decision, “[t]he inquiry in such a case shall extend to the questions whether the respondent has proceeded without, or in excess of jurisdiction; whether there was a fair trial;
 
 *334
 
 and whether there was any prejudicial abuse of discretion. Abuse of discretion is established if the respondent has not proceeded in the manner required by law, the order or decision is not supported by the findings, or the findings are not supported by the evidence.” (Code Civ. Proc., § 1094.5, subd. (b).)
 

 [8]
 

 The contract between Polaroid and the DMV has been the subject of at least four lawsuits. In addition to the two actions which are the subjects of this consolidated appeal, Service Employees International Union, Local 22, and two taxpayers, in a third lawsuit, petitioned for writ of mandate alleging the DMV had a duty to reject Polaroid’s bid. The superior court dismissed the petition with prejudice. Although the petitioners appealed, they subsequently abandoned their appeal. NBS instituted a fourth lawsuit, NBS Imaging Systems, Inc. v. Stamison (Super. Ct. Sacramento County, No. 96CS03149), after entry of the preliminary injunction which is challenged in this appeal. This fourth lawsuit is currently pending in the superior court.
 

 As previously noted, NBS has been the vendor for California drivers’ licenses since 1962. NBS’s contract with the DMV, which has remained in effect due to the issuance of the
 
 *335
 
 preliminary injunction, pays NBS $0.74 per license. Under the challenged contract, Polaroid would receive $0.49 per license.
 

 The Legislature has emphasized the importance of timeliness in the state’s acquisition of goods and services pertaining to electronic data processing systems and telecommunications systems. (See, e.g., Pub. Contract Code, §§ 12100 [“. . . this separate authority should enable the
 
 timely
 
 acquisition of goods and services . . . .” (italics added)], 12101
 
 [“expeditious
 
 and value-effective acquisition of electronic data processing and telecommunications goods and services (italics added)], 12102, subd. (h) [requiring filing of protest
 
 “no later than five working days
 
 after the issuance of an intent to award” and filing detailed statement
 
 “[w]ithin 10 calendar days
 
 after filing a protest . . . .” (italics added)].) In light of the Legislature’s expressed intent to promote the expeditious acquisition of, and expeditious resolution of disputes involving the acquisition of, such goods and services, it may wish to consider imposing additional restrictions which would promote this goal, such as limiting the parties who may protest, limiting the matters which may be protested, imposing additional timelines within which protests and appeals must be heard, or limiting the scope of administrative or judicial review. (Cf.
 
 Moncharsh
 
 v.
 
 Heily & Blase
 
 (1992) 3 Cal.4th 1, 9-10 [10 Cal.Rptr.2d 183, 832 P.2d 899] [in arbitration context, judicial intervention minimized].)
 

 [9]
 

 Former section 1285(4) of the State Administrative Manual no longer exists. It formerly provided: “A person, firm or subsidiary who was awarded a consulting services contract may not submit a bid for nor be awarded a contract for the services or goods suggested in that consulting services contract (See Public Contract Code Section 10365.5) except: FU a. A person, firm, or subsidiary who was awarded a subcontract of no more than 10 percent of the
 
 *336
 
 total monetary value of a consulting services contract is exempt; [ID b. Contracts for consulting architect or engineer services pursuant to Government Code Section 4525 et seq. are exempt.”
 

 Even aside from NBS’s failure to exhaust its administrative remedies with respect to former section 1285(4), as discussed
 
 post,
 
 the contention fails for an additional reason. Although the superior court expressly stated it was treating former section 1285(4) as a regulation, our Supreme Court has held unless regulations are adopted pursuant to the Administrative Procedures Act, they are void. Thus, the provisions of the State Administrative Manual have no legal effect and cannot form the basis for invalidating Polaroid’s bid. (See
 
 Tidewater Marine Western, Inc.
 
 v.
 
 Bradshaw
 
 (1996) 14 Cal.4th 557, 570, 571 [59 Cal.Rptr.2d 186, 927 P.2d 296] [“A regulation subject to the APA thus has two principal identifying characteristics. [Citation.] First, the agency must intend its rule to apply generally, rather than in a specific case. . . . Second, the rule must ‘implement, interpret, or make specific the law enforced or administered by [the agency], or . . . govern [the agency’s] procedure’ ”]; see also Willis v.
 
 State of California
 
 (1994) 22 Cal.App.4th 287,291 [27 Cal.Rptr.2d 413] [State Administrative Manual is “without legal effect”].)
 

 [10]
 

 NBS raised paragraph II.B.15 of the RFP in a posthearing brief. In this belatedly raised argument, NBS contended the RFP itself prevented the DMV from granting Polaroid the challenged contract due to a conflict of interest provision which provided: “No person, firm, or subsidiary thereof who has been awarded a consulting services contract, or a contract which includes a consulting component, may be awarded a contract for the provision of services, delivery of goods or supplies, or any other related action which is required, suggested, or otherwise deemed appropriate as an end product of the consulting services contract. Therefore, any consultant that contracts with a State agency to develop a feasibility study or provide formal recommendations for the acquisition of [electronic data processing] products or services is precluded from contracting] for any work recommended in the feasibility study or the formal recommendation.”
 

 [11]
 

 NBS attempts to bootstrap its belatedly raised arguments concerning State Administrative Manual former section 1285(4) and RFP DMV-3026 paragraph II.B.15 to its original protest arguments. NBS argues it “consistently raised the issue of GDI’s violation of state conflict of interest law and policy regarding consultants specifically referencing § 10365.5 and the policies incorporated in the State Administrative Manual.” By making this argument, NBS hopes to avoid the application of the exhaustion of remedies doctrine and
 
 Digital Biometrics, Inc.
 
 v.
 
 Anthony, supra,
 
 13 Cal.App.4th 1145. However, NBS’s reference to “the policies incorporated in the State Administrative Manual” did not, in the administrative proceedings, timely mention either former section 1285(4) or RFP DMV-3026 paragraph II.B.15. In light of the specificity mandated by Public Contract Code section 12102, subdivision (h), a mere general reference to “conflict of interest” was insufficient to implicate nonarticulated theories which relied upon specific provisions in the State Administrative Manual and the RFP.
 

 Alternatively, NBS contends it would have been futile to have raised these arguments during the administrative proceedings. However, the superior court’s reliance upon these two new arguments in granting NBS relief—and the court’s express rejection of the original arguments raised by NBS in the administrative proceedings—render NBS’s futility contention disingenuous. Moreover, and in any event, there is no indication the Board had predetermined its conclusion. (See
 
 George Arakelian Farms, Inc.
 
 v.
 
 Agricultural Labor Relations Bd.
 
 (1985) 40 Cal.3d 654, 662-663 [221 Cal.Rptr. 488, 710 P.2d 288] [“Insofar as a ‘futility’ exception exists, ... its application is very limited. Thus, exhaustion of administrative remedy is required unless the appellant ‘can
 
 positively
 
 state that the [administrative agency] has declared what its ruling will be in a
 
 particular
 
 case.’ [Citation.] There is no indication in this record to show that, at the time that a request for review would have been timely, the board had predetermined its position . . . .” (italics in original)].)
 

 [12]
 

 Although the superior court found Public Contract Code section 10365.5 and State Administrative Manual former section 1285(4) “have the same legal effect,” the court rejected NBS’s arguments pursuant to Public Contract Code section 10365.5 and relied on State Administrative Manual former section 1285(4) in granting relief. At oral argument, NBS’s counsel acknowledged the discrepant results of the superior court’s reasoning, and asserted his client’s position relied on the application of Public Contract Code section 10365.5.
 

 [13]
 

 At oral argument, NBS’s counsel denied making any such concession. However, we are bound by the determination of the trier of fact on this factual issue. NBS also offers a number of related arguments in its efforts to circumvent section 10365.5’s exemption for electronic data processing procurements. Among other things, NBS cites a different conflict of interest statute, Government Code section 1090, apparently assuming one conflict of interest statute is the same as any other. However, Government Code section 1090 applies only to specified
 
 *339
 
 public officers and employees and thus has no application to this matter. (See
 
 People
 
 v.
 
 Honig
 
 (1996) 48 Cal.App.4th 289, 313-314 [55 Cal.Rptr.2d 555].)
 

 NBS also contends “the Board failed to recognize that the operative contract for purposes of the applicability of § 10365.5 to CDI was the CDI 1991 ‘consulting services’ contract with DMV[,] not REP DMV 3026. . . . It is the . . . ‘consulting services’ contract which imposed on CDI the conflict of interest prohibitions of § 10365.5.” According to NBS, “CDI advised DMV on the database requirements of RFP DMV 3026” as part of its previous DMV contract, and thus was prohibited from participating in the later DMV Project. NBS also contends CDI does not come within the exemption because “[transactions covered under Chapter 3” are contracts for “electronic data processing” and “telecommunications” goods and services, not consulting services contracts.
 

 NBS and Polaroid additionally offer dueling snippets of legislative history, with NBS asserting the Legislature intended Public Contract Code section 10365.5 to operate broadly in order “to close a loophole in the law which allowed consultants to profit from conflicts of interest.” With regard to this latter contention, the exemption for electronic data processing procurements contains no ambiguity, and thus there is no need to examine the legislative history. (See
 
 Delaney
 
 v.
 
 Superior Court
 
 (1990) 50 Cal.3d 785, 798 [268 Cal.Rptr. 753, 789 P.2d 934] [“ ‘[i]f the [statutory] language is clear and unambiguous there is no need for construction, nor is it necessary to resort to indicia of the intent of the Legislature. . . .’”].)
 

 All of the aforementioned arguments, and NBS’s related contentions, suffer from the same flaw: As explained herein, even if Public Contract Code section 10365.5 applied to GDI’s participation in the DMV Project, we would not find a disqualifying conflict of interest.
 

 [14]
 

 Ironically, despite NBS’s protestations concerning the housing of the database under the challenged contract between Polaroid and the DMV, under the
 
 existing
 
 contract between NBS and the DMV,
 
 NBS housed and maintained the photo image database on its computer hardware at its facility.
 

 [15]
 

 NBS’s arguments concerning section 5202 suffer from the additional limitation that the State Administrative Manual has no legal effect. (See fn. 9,
 
 ante.)